**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 1:21-cr-00599-RBW** |
| **v.** | : | |
| | : | |
| **DONNIE WREN, and** | : | |
| **THOMAS SMITH,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S OPPOSITION TO SMITH'S MOTION TO DISMISS COUNT**
**THREE OF THE SUPERSEDING INDICTMENT**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this opposition to defendant Thomas Smith's motion

to dismiss Count Three of the Superseding Indictment ("Indictment"), charging Smith with

obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). ECF No. 51. The

arguments in Smith's motion are identical to those rejected by many courts in this district. *See,*

*e.g.*, *United States v. Fitzsimons*, 605 F. Supp. 3d 132, 137-150 (D.D.C. 2022) (Contreras, J.);

*United States v. Bingert*, 605 F. Supp. 3d 111, 118-128 (D.D.C. 2022) (Lamberth, J.); *United States*

*v. Hale-Cusanelli*, No. 21-cr-37, 2022 WL 4300000, at *1 (D.D.C. Sept. 19, 2022) (*see also*

Pretrial Conf. Tr., *Hale-Cusanelli,* No. 21-cr-37, ECF No. 82 at 2-9 (D.D.C. May 6, 2022))

(McFadden, J.); *United States v. McHugh*, No. 21-cr-453, 2022 WL 1302880, at *2-*13 (D.D.C.

May 2, 2022) (Bates, J.); *United States v. Puma*, 596 F. Supp. 3d 90, 107 n.4 (D.D.C. 2022)

(D.D.C. Mar. 19, 2022) (Friedman, J.); *United States v. Bozell*, 21-cr-216, 2022 WL 474144, at *5

(D.D.C. Feb. 16, 2022) (Bates, J.); *United States v. Grider*, 585 F. Supp. 3d 21 (D.D.C. 2022)

(Kollar-Kotelly, J.); *United States v. Nordean*, 579 F. Supp. 3d 28 (D.D.C. 2021) (D.D.C. 2021)

(Kelly, J.); *United States v. Montgomery*, 578 F. Supp. 3d 54, (D.D.C. 2021) (Moss, J.); *United*

1

*States v. Mostofsky*, 579 F.Supp.3d 9 (D.D.C. 2021) (Boasberg, J.); *United States v. Caldwell*, 581 F. Supp. 3d 1 (D.D.C. 2021) (Mehta, J.); *United States v. Sandlin*, 575 F. Supp. 3d 16 (D.D.C. 2021) (Friedrich, J.). Nothing in Smith's motion warrants a departure from those rulings, so the Court should deny it.

## FACTUAL BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was underway, a large crowd gathered outside the United States Capitol building, entered the restricted grounds, and forcibly breached the Capitol building. As a result, the Joint Session and the entire official proceeding of the Congress were halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

Defendants Thomas Smith and Donnie Wren, cousins, traveled together to Washington, D.C. to attend former President Trump's rally on January 6, 2021. After the rally, Smith and Wren walked from the rally to the United States Capitol. They entered Capitol grounds and joined in the riot.

Smith and Wren were in the Lower West Terrace Tunnel area at around 3:00 p.m. They made their way to the Tunnel entrance. Wren remained at the mouth of the Tunnel while Smith, carrying a flag attached to a flagpole, entered the Tunnel and approached the police line standing guard at the doors leading into the Capitol building. Moments later, Smith jammed the flagpole like a spear trying to stab at one of the glass windowpanes within the first set of Tunnel doors.

Less than an hour later, at approximately 3:50 p.m., Smith and Wren made their way to the Upper West Terrace, where they stood directly in front of the police line, walking back and forth

and waving flags for approximately 10 minutes. A physical conflict began between the police and the crowd of rioters at approximately 4:21 p.m. Smith and Wren participated in this conflict, pushing back against the officers' riot shields for approximately 25 seconds. Smith turned his back to the officers then used his body weight to push into a police riot shield.

Following the physical confrontation with the police line, Smith charged into a crowd of rioters to kick an officer's backside, then darted out of the crowd. Moments later, Smith threw a metal stick or pole at the police line. The metal stick or pole hit an officer in the head, causing the officer to stagger backwards. Smith then retreated into the crowd of rioters.

Smith and Wren left the Upper West Terrace area at approximately 4:30 p.m. and began their departure from the Capitol grounds.

## PROCEDURAL HISTORY

Count Three of the Second Superseding Indictment states as follows:

> On or about January 6, 2021, within the District of Columbia and elsewhere, **THOMAS SMITH** attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.
>
> (**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

(ECF No. 71.)

Smith was arraigned on the Indictment on December 28, 2022. On February 24, Smith filed a Motion to Dismiss Count Three of the Superseding Indictment.[1] ECF No. 66.

---

[1]    Smith's motion was filed before the Second Superseding Indictment was returned. The language of this charge remains the same between the Superseding and Second Superseding Indictments.

## LEGAL STANDARD

An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). An indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the Government "has made a *full* proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here.

Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *United States v. Bailey*, 444 U.S. 394, 413, n.9 (1980) (motions for summary judgment are creatures of civil, not criminal trials); *Yakou*, 428 F.2d at 246-47 ("There is no federal criminal procedural mechanism

that resembles a motion for summary judgment in the civil context"); *United States v. Oseguera Gonzalez*, No. 20-cr-40-BAH at *5, 2020 WL 6342948 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts of what the Government can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016). Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination.

Thus, when ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and more specifically, the language used to charge the crimes. *United States v. Bingert*, 21-cr-93 (RCL) (ECF No. 67 at 5) (a motion to dismiss challenges the adequacy of an indictment on its face and the relevant inquiry is whether its allegations permit a jury to find that the crimes charged were committed); *McHugh*, 2022 WL 1302880 at *2 (a motion to dismiss involves the Court's determination of the legal sufficiency of the indictment, not the sufficiency of the evidence); *United States v. Puma*, 596 F. Supp. 3d 90, 96 (D.D.C. 2022) (quoting *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009)).

## ARGUMENT

Smith's Motion to Dismiss Count Three of the Indictment, alleging a violation of 18 U.S.C. § 1512(c)(2), should be denied. Count Three charges Smith with corruptly obstructing, influencing, or impeding an "official proceeding," – *i.e.*, Congress's certification of the Electoral College vote on January 6, 2021 – in violation of 18 U.S.C. § 1512(c)(2).

In 2002, Congress enacted Section 1512(c)'s prohibition on "[t]ampering with a record or otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-

204, 116 Stat. 745, 807. Section 1512(c)'s prohibition applies to:

> [w]hoever corruptly--
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2)   *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.*

18 U.S.C. § 1512(c) (emphasis added). Section 1515(a)(1), in turn, defines the phrase "official proceeding" to include "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B). By the statute's plain terms, then, a person violates Section 1512(c)(2) when, acting with the requisite *mens rea*, he engages in conduct that obstructs a specific congressional proceeding, including, as here, Congress's certification of the Electoral College vote.

Notwithstanding the plain terms of the offense, Smith advances two arguments for the notion that Section 1512(c)(2) does not reach the conduct alleged in the indictment: (1) that Section 1512(c)(2) only prohibits acts related to documents, records, or other tangible evidence, and (2) that Congress's certification of the Electoral College vote is not an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2). ECF No. 66.

Many judges of this District have considered the arguments Smith raises. *See, e.g., Bingert*, 605 F. Supp. 3d at 117 n.3.  Every district judge to have reached the issue has concluded that Congress's certification of the Electoral College is an "official proceeding" within the meaning of 18 U.S.C. 1512(c)(2).  In addition, every reported court of appeals decision to have considered the scope of Section 1512(c)(2), and all but one of the judges of this Court to have considered the issue in cases involving January 6, 2021, have concluded that Section 1512(c)(2) prohibits obstruction regardless of its connection to documentary or tangible evidence.  And, in

any event, even if a nexus to documentary or tangible evidence were required, the allegations in the Indictment, which track the statutory language, adequately inform Smith about the charge against him; nothing more is required. *See, e.g.*, *Williamson*, 903 F.3d at 130-131.

**I.      Section 1512(c)(2) Applies to the Conduct Alleged in the Indictment.**

Smith's first argument mirrors Judge Nichols' decision in *Miller* and contends that Smith's conduct, like that of Miller, fails to fit within the scope conduct prohibited by Section 1512(c)(2). *United States v. Miller*, 589 F. Supp. 3d 60 (D.D.C.), *reconsideration denied*, 605 F. Supp. 3d 63, 78 (D.D.C. 2022). But *Miller* was wrongly decided, because § 1512(c)(2) is not limited by subsection (c)(1) – which refers to "alter[ing], destroy[ing], mutilat[ing] or conceal[ing] a record, document, or other object" specifically.

> **a.    Section 1512(c)(2)'s text, structure, and history confirm that its prohibition covers obstructive conduct unrelated to documentary evidence.**

In Section 1512(c)(2), Congress prohibited conduct that intentionally and wrongfully obstructs official proceedings. The ordinary meaning of "obstructs, influences, or impedes" encompasses a range of conduct designed to frustrate an official proceeding. That conduct can include lying to a grand jury or in civil proceedings, exposing the identity of an undercover agent, or burning a building to conceal the bodies of murder victims. It also includes storming the Capitol to derail a congressional proceeding. A defendant who, acting with the necessary *mens rea*, obstructs Congress's certification of the Electoral College vote, commits a crime under Section 1512(c)(2).

> **b.    Section 1512(c)'s text and structure confirm that Section 1512(c)(2) is not limited to document-related obstructive conduct**.

Section 1512(c)(2)'s plain text demonstrates that it prohibits any corrupt conduct that intentionally obstructs or impedes an official proceeding. When interpreting a statute, courts look

first to the statutory language, "giving the words used their ordinary meaning." *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks omitted). If the statutory language is plain and unambiguous, this Court's "inquiry begins with the statutory text, and ends there as well." *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 631 (2018) (internal quotation marks omitted). Here, the meaning of "obstruct, influence, or impede" is controlled by the ordinary meaning of those words.

The verbs Congress selected in Section 1512(c)(2) are "noncontroversial." *Montgomery*, 578 F. Supp. at 70. The words "obstruct" and "impede" naturally "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'" *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (citing dictionaries). Similarly, "influence" includes "affect[ing] the condition of" or "hav[ing] an effect on." *Influence*, Oxford English Dictionary, *available at* http://www.oed.com. These verbs plainly apply to obstructive conduct that otherwise might not fall within the definition of document or evidence destruction. *See United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013). When read with Section 1512(c)(2)'s subject ("whoever") and object ("any official proceeding"), those verbs prohibit a defendant "from coming in the way of, blocking, or holding up the business conducted by an official body, such as a court or the Congress, when that body has formally convened for the purpose of conducting that business." *Montgomery*, 578 F. Supp. 3d at 70. Comparing the language in Section 1512(c)(1) to that in Section 1512(c)(2) confirms that the latter, unlike the former, is not a document-focused provision. Section 1512(c) consists of two provisions requiring the defendant to act "corruptly." Both contain a string of verbs followed by one or more direct objects. Section 1512(c)(1) applies to whoever corruptly "alters, destroys, mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding." The objects—"a record, document, or other object"—are static.

In contrast, Section 1512(c)(2) applies to whoever corruptly "obstructs, influences, or impedes any official proceeding." The object—"proceeding"—is dynamic, and the verbs that precede it are all intended to change the movement or course of that "proceeding." They are verbs that do not apply to a fixed "record" or "document" or an inanimate "object." The two sections are related through their connection to an official proceeding: Section 1512(c)(1)'s verbs target forms of evidence tampering (*e.g.*, altering, destroying mutilating) directed at the documents, records, and objects that are used in official proceedings, while Section 1512(c)(2)'s verbs take the proceeding itself as the object—thus prohibiting whatever conduct blocks or interferes with that proceeding without regard to whether that conduct involved documentary or intangible evidence.

Importing into Section 1512(c)(2) a nexus-to-documents requirement would not only require inserting an extratextual gloss, *see Dean v. United States*, 556 U.S. 568, 572 (2009) (courts "ordinarily resist reading words or elements into a statute that do not appear on its face") (internal quotation marks omitted), it would also render the verbs in Section 1512(c)(2) inapt. The *actus reus* that the verbs in Section 1512(c)(2) encompass is obstructing, influencing, and impeding. But "[h]ow [could] anyone alter, destroy, mutilate or conceal an 'official proceeding' or how [could] anyone 'obstruct, influence, or impede' 'a record, document, or other object'?" *Montgomery*, 578 F. Supp. 3d at 75; *accord Fitzsimons*, 605 F. Supp. 3d at 150; *cf. Yates v. United States*, 574 U.S. 528, 551 (2015) (Alito, J., concurring) (rejecting interpretation of "tangible object" in Section 1519 that would include a fish in part because of a mismatch between that potential object and the statutory verbs: "How does one make a false entry in a fish?"); *id.* at 544 (plurality opinion) ("It would be unnatural, for example, to describe a killer's act of wiping his fingerprints from a gun as 'falsifying' the murder weapon."). Such a mismatch is even more unlikely given how readily Congress could have drafted language that supplies a nexus to documents in Section 1512(c)(2).

9

*See Montgomery*, 578 F. Supp. 3d at 73. (Congress could have enacted a prohibition that covers anyone who "'engages in conduct that otherwise impairs the integrity or availability of evidence or testimony for use in an official proceeding'").

Consistent with the interpretation that obstructive behavior may violate Section 1512(c)(2) even where the defendant does not "take some action with respect to a document," *Miller* at 117, courts of appeals have upheld convictions under Section 1512(c)(2) for defendants who attempted to secure a false alibi witness while in jail for having stolen a vehicle, *United States v. Petruk*, 781 F.3d 438, 440, 447 (8th Cir. 2015); disclosed the identity of an undercover federal agent to thwart a grand jury investigation, *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009); lied in written responses to civil interrogatory questions about past misconduct while a police officer, *Burge*, 711 F.3d at 808-09; testified falsely before a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); solicited information about a grand jury investigation from corrupt "local police officers," *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014); and burned an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (unpublished); *see also United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects before issuance or execution of search warrants), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target).

Interpreted correctly, Section 1512(c)(2) applies to Smith's conduct, which involved trespassing onto the restricted Capitol grounds and into the Lower Terrace Tunnel as part of a mob and attacking a window and officers attempting to clear the area—all for the purpose of stopping the certification. In so doing, Smith hindered and delayed an "official proceeding"

before Congress.  *See* 18 U.S.C. § 1515(a)(1)(B).  Because construing Section 1512(c)(2) to reach such conduct would neither "frustrate Congress's clear intention" nor "yield patent absurdity," this Court's "obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted).

      **c.  The term "otherwise" reinforces that Section 1512(c)(2) covers obstructive conduct "other" than the document destruction covered in Section 1512(c)(1).**

Smith's textual analysis overlooks Section 1512(c)(2)'s verbs and focuses almost entirely on the term "otherwise."  But that term, properly interpreted, does not support such a narrowed interpretation of Section 1512(c)(2).

The term "otherwise" means "in another way" or "in any other way." *Otherwise*, Oxford English Dictionary, *available at* http://www.oed.com.  Consistent with its ordinary meaning, the term "otherwise" conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that Section 1512(c)(1) proscribes. *Burge*, 711 F.3d at 809; *Petruk*, 781 F.3d at 446-47 (noting that "otherwise" in Section 1512(c)(2), understood to mean "in another manner" or "differently," implies that the obstruction prohibition applies "without regard to whether the action relates to documents or records") (internal quotation marks omitted); *United States v. Ring*, 628 F.Supp.2d 195, 224 n.17 (D.D.C. 2009) (noting that Section 1512(c)(2) is "plainly separate and independent of" Section 1512(c)(1) and declining to read "otherwise" in Section 1512(c)(2) "as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-tampering");  *see also Gooch v. United States*, 297 U.S. 124, 126-28 (1936) (characterizing "otherwise" as a "broad term" and holding that a statutory prohibition on kidnapping "'for ransom or reward or otherwise'" is not limited by the words "ransom" and "reward" to kidnappings for pecuniary benefit); *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (construing "otherwise" in 28 U.S.C.

§ 2466(a)(1)(C) to reach beyond the "specific examples" listed in prior subsections, thereby covering the "myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court"). That reading follows inescapably from the text of Section 1512(c)'s two subsections read together: Section 1512(c)(1) "describes how a defendant can violate the statute by 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing]' documents for use in an official proceeding," *Puma*, 596 F. Supp. 3d at 107 while "otherwise" in Section 1512(c)(2) "signals a shift in emphasis . . . from actions directed at evidence to actions directed at the official proceeding itself," *Montgomery*, 578 F. Supp. 3d at 72 (internal quotation marks omitted).

Contrary to Smith's suggestion that Section 1512(c)(2) is untethered to Section 1512(c)(1), "otherwise" as used in Section 1512(c)(2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1).[2] That understanding of "otherwise" is fully consistent with any reasonable definition of the term and does not render the term "surplusage."

This interpretation is not inconsistent with the canons of construction used in *Begay v. United States*, 553 U.S. 137 (2008) and *Yates*, 574 U.S. 528. In considering whether driving under the influence was a "violent felony" for purposes of the Armed Career Criminal Act ("ACCA")'s residual clause, which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a*

---

[2]    Smith cites a memo written by former Attorney General William Barr. ECF No. 66 at 6-7 (quoting Memorandum from William Barr to Rod Rosenstein, Deputy Att'y Gen., Dep't of Justice (June 8, 2018), available at https://s3.documentcloud.org/documents/5638848/June-2018-Barr-Memo-to-DOJ-Muellers-Obstruction.pdf). But the memorandum was written by private citizen William Barr. It was not issued while Mr. Barr was the Attorney General of the United States, and the Department of Justice has not adopted the memo or its reasoning. The memo is simply one private citizen's take on a legal issue. "[A]ny suggestion that the memorandum represents the views of the Department of Justice is inaccurate." *Montgomery*, 2021 WL 6134591, at *10.

*serious potential risk of physical injury*," 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added), the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure than Section 1512(c)(2). *See Sandlin*, 575 F. Supp. 3d 16, 25-26 (D.D.C. 2021) (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in Section 1512(c)(2) is "set off by both a semicolon and a line break"). Unlike in the ACCA residual clause, the "otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by any limiting examples." *Ring*, 628 F. Supp. 2d at 224 n.17. In other words, the "key feature" in Section 924(e)(2)(B)(ii) at issue in *Begay*, "namely, the four example crimes," 553 U.S. at 147, is "absent" in Section 1512(c)(2). *Caldwell*, 581 F. Supp. 3d at 24.

In fact, Section 1512(c)(2) is a poor fit for application of the *ejusdem generis* canon that *Begay* applied to the ACCA residual clause and that *Miller* functionally applied to Section 1512(c). "Where a general term follows a list of specific terms, the rule of *ejusdem generis* limits the general term as referring only to items of the same category." *United States v. Espy*, 145 F.3d 1369, 1370- 71 (D.C. Cir. 1998). But Section 1512(c)'s structure differs significantly: it includes one numbered provision that prohibits evidence-tampering, followed by a semi-colon, the disjunctive "or," and then a separately numbered provision containing the separate catchall obstruction prohibition. "The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). Furthermore, in the same way that the *ejusdem generis* canon does not apply to the omnibus clause in Section 1503 that is "one of . . . several distinct and independent prohibitions" rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable," *Aguilar*, 515 U.S. at 615 (Scalia, J., concurring in part and dissenting in part), it has

no application to Section 1512(c)(2), which embodies the same structure. *Cf. Loughrin v. United States*, 573 U.S. 351, 359 (2014) (distinguishing the mail fraud statute (18 U.S.C. § 1341), which "contains two phrases strung together in a single, unbroken sentence," from the bank fraud statute (18 U.S.C. § 1344), which comprises "two clauses" with "separate numbers, line breaks before, between, and after them, and equivalent indentation—thus placing the clauses visually on an equal footing and indicating that they have separate meanings"); *see also McHugh*, 2022 WL 1302880, at \*5 (explaining that the *ejusdem generis* canon on which *Miller* relied is "irrelevant" because rather than the "A, B, C, or otherwise D" structure found in the ACCA residual clause, Section 1512(c) "follows the form '(1) A, B, C, or D; or (2) otherwise E, F, or G'").

Moreover, *Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii)—burglary, arson, extortion, or crimes involving explosives—indicated that the ACCA residual clause covered only similar crimes. *Begay*, 553 U.S. at 142. Those examples, the majority reasoned, demonstrated that Section 924(e)(2)(B)(ii) was not designed "to be all encompassing," but instead to cover only "crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Id.* at 142-43. The majority next drew support for its conclusion from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" that would have covered offenses involving the substantial use of physical force and described Section 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples. *Id.* at 143-44. In the final paragraph of that section of the opinion, the majority addressed "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "*sufficient* to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' *can* (we do not say *must* . . .)

14

refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144.

The majority's "remarkably agnostic" discussion of "otherwise" in *Begay*, which explicitly noted that the word may carry a different meaning where (as here) the statutory text and context indicates otherwise, *Montgomery*, 578 F. Supp. 3d at 71, suggests, if anything, that "*the government's* interpretation of 'otherwise' [in Section 1512(c)(2)] is the word's more natural reading," *McHugh*, 2022 WL 1302880, at *5 n.9; *see also Caldwell*, 581 F. Supp. 3d at 24 (declining to depart from the "natural reading" of "otherwise" to mean "'in a different way or manner'" based on the discussion in *Begay*). In short, the majority in *Begay* "placed little or no weight on the word 'otherwise' in resolving the case." *Montgomery*, 578 F. Supp. 3d at 71. Whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s holding and the subsequent interpretation of the ACCA residual clause demonstrate the central flaw with imposing an extratextual requirement within Section 1512(c)(2). The Supreme Court held in *Begay* that Section 924(e)(2)(B)(ii) encompasses only crimes that, like the listed examples, involve "purposeful, 'violent,' and 'aggressive' conduct." 553 U.S. at 144-45. But "*Begay* did not succeed in bringing clarity to the meaning of the residual clause." *Johnson v. United States*, 576 U.S. 591, 600 (2015). Just as the *Begay* majority "engraft[ed]" the "purposeful, violent, and aggressive conduct" requirement onto the ACCA's residual clause, 553 U.S. at 150 (Scalia, J., concurring in judgment) (internal quotation marks omitted), so too would Smith's proposed interpretation engraft onto Section 1512(c)(2) the requirement that a defendant "have taken some action with respect to a document, record, or other object" to obstruct an official proceeding.

In the nearly 20 years since Congress enacted Section 1512(c)(2), no reported cases have

adopted that interpretation, and for good reason. That interpretation would give rise to unnecessarily complex questions about what sort of conduct qualifies as "tak[ing] some action with respect to a document" to obstruct an official proceeding. *Cf. United States v. Singleton*, No. 06-cr-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished) (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05- cr-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceeding through his conduct in relation to a tangible object").[3] Smith's interpretation is likely to give rise to the very ambiguity it purports to avoid.

> **d. Tools of statutory interpretation do not support the *Miller* Court's narrowed interpretation.**

Other tools of statutory construction reinforce the conclusion that Section 1512(c)(2) reaches conduct that obstructs or impedes an official proceeding in a manner other than through document destruction or evidence tampering. Section 1512 is comprised of two parts: four subsections that define criminal offenses (Sections 1512(a)-(d)), followed by six subsections that provide generally applicable definitions and clarifications (Sections 1512(e)-(j)).[4] Within

---

[3]      Smith's interpretation of Section 1512(c)(2) resembles the reading given in *Singleton* and *Hutcherson*, both of which are unpublished. As noted in the main text, no other court, at least in a reported opinion, appears to have adopted the nexus-to-tangible-evidence-or-a-tangible-object standard articulated in *Singleton* and *Hutcherson*. *See United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 250-51 (S.D. Tex. 2020) (identifying *Singleton* and *Hutcherson* as outliers from the "most popular—and increasingly prevalent—interpretation of § 1512(c)(2) [as] an unlimited prohibition on obstructive behavior that extends beyond merely tampering with tangible items"); *Ring*, 628 F.Supp.2d at 225 n.18 (disagreeing with *Singleton* and *Hutcherson* but finding that the alleged conduct at issue in that case involved "some nexus to documents"). No court of appeals has cited either case.

[4]      Section 1512 also includes one subsection, placed at the end, that adds a conspiracy offense applicable to any of the substantive offenses set out in Sections 1512(a)-(d). 18 U.S.C.

the first part, three subsections (Sections 1512(a)-(c)) define criminal offenses with statutory

maxima of at least 20 years, *see* §§ 1512(a)(3), (b)(3), (c), while Section 1512(d) carries a three-

year statutory maximum. Within that structure, Congress sensibly placed Section 1512(c)(2) at

the very end of the most serious—as measured by statutory maximum sentences—obstruction

offenses, precisely where a "catchall" for obstructive conduct not covered by the more specific

preceding provisions would be expected. In any event, the "mousehole" canon provides that

Congress "does not alter the fundamental details of a regulatory scheme in vague terms or

ancillary provisions," *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001),

but it "has no relevance" where, as here, the statute in question was written in "broad terms,"

*Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1753 (2020).

Any concern that a reading of Section 1512(c)(2) that incorporates obstructive conduct

unrelated to documents would render superfluous the remainder of Section 1512 is unfounded.

Overlap is "not uncommon in criminal statutes," *Loughrin*, 573 U.S. at 358 n.4, and Section

1512(c)(2)'s broader language effectuates its design as a backstop in the same way that a

"generally phrased residual clause . . . serves as a catchall for matters not specifically

contemplated." *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009).  Moreover, the "mere fact

that two federal criminal statutes criminalize similar conduct says little about the scope of

either." *Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005).

Any overlap between Section 1512(c)(2) and other provisions in Section 1512 has a

simple explanation that does not warrant *Miller*'s narrowing construction. *McHugh*, 2022 WL

1302880, at *8. When Congress enacted the "direct obstruction" provision in Section

1512(c)(2), that provision necessarily included the "indirect obstruction prohibited" in the rest of

---

§ 1512(k).

Section 1512. *Id.* Congress in Section 1512(c)(2) therefore did not "*duplicate* pre-existing provisions . . . but instead *expanded* the statute to include additional forms of obstructive conduct, necessarily creating overlap with the section's other, narrower prohibitions." *Id.* Congress was not required to repeal those pre-existing prohibitions and rewrite Section 1512 "to create a single, blanket obstruction offense" just to avoid overlap. *Id.* at *9. "Redundancies across statutes are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and the rule of thumb that statutes should be interpreted to avoid superfluity necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and means in a statute what it says there," *id.* at 253-54. In other words, Section 1512(c)(2) "creates only explicable and indeed inevitable overlap rather than outright redundancy," such that the "purported superfluity" in Section 1512 "simply does not justify displacing the provision's ordinary meaning." *McHugh*, 2022 WL 1302880, at *10. That is particularly so here because even a "broad interpretation of § 1512(c)(2) does not entirely subsume numerous provisions within the chapter," and any overlap with other provisions in Section 1512 is "hardly remarkable." *Sandlin*, 575 F. Supp. 3d at 27; *accord United States v. Nordean*, 579 F. Supp. 3d 28, 42 (D.D.C. 2021).

Notably, Smith's interpretation injects a more troubling type of superfluity. Construing Section 1512(c)(2) to require some action with respect to a document risks rendering Section 1512(c)(2) itself superfluous considering the "broad ban on evidence-spoliation" in Section 1512(c)(1). *Yates*, 574 U.S. at 541 n.4 (plurality opinion) (internal quotation marks omitted); *cf. United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991) (explaining that limiting the catchall provision in Section 1503(a)'s omnibus clause to obstructive acts "directed against individuals" would render the omnibus clause superfluous because "earlier, specific

prohibitions" in Section 1503(a) "pretty well exhaust such possibilities") (internal quotation marks omitted). The canon against surplusage is "strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). It is even stronger here, when it would render superfluous "other provisions in the *same enactment*"—namely, the Sarbanes-Oxley Act. *Freytag v. Comm'r*, 501 U.S. 868, 877 (1991) (emphasis added; internal quotation marks omitted). At a minimum, the canon does not militate in favor of Smith's reading. *See United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013) (canon against surplusage "'merely favors that interpretation which avoids surplusage,' not the construction substituting one instance of superfluous language for another").

Finally, an interpretation of Section 1512(c)(2) that imposes criminal liability only when an individual takes direct action "with respect to a document, record, or other object" to obstruct a qualifying proceeding leads to absurd results. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (rejecting interpretation of a criminal statute that would "produce results that were not merely odd, but positively absurd"). That interpretation would appear not to encompass an individual who seeks to "obstruct, influence, or impede" a congressional proceeding by explicitly stating that he intends to stop the legislators from performing their constitutional and statutory duties to certify the Electoral College vote results by contributing to a mob intent on violently breaching the Capitol and resisting police efforts to clear the area, unless he also picked up a "document or record" related to the proceeding during that attack. The statutory text does not require such a counterintuitive result.

## II.   Even if Section 1512(c)(2) Required that the Obstructive Act Relate to Documentary Evidence, Smith's Conduct Would Be Covered.

Neither ordinary methods of statutory construction nor the rule of lenity supports limiting to Section 1512(c)(2) to document-based obstructive conduct. But even if Section

1512(c)(2) were so limited, it necessarily reaches beyond the direct evidence tampering already covered by Section 1512(c)(1) to include alternative ways of interfering with the consideration of documentary evidence—as happened here when Smith impeded lawmakers' consideration of documents and records at the Electoral College vote certification proceeding.

At a minimum, Section 1512(c)(2) covers conduct that prevents the examination of documents, records, and other nontestimonial evidence in connection with an official proceeding. Even assuming a focus on documentary evidence, the additional conduct that it would cover beyond Section 1512(c)(1) would include, for example, corruptly assaulting the Capitol building and its protectors and occupying the Tunnel and Upper West Terrace preventing Congress from considering the Electoral College ballots and records, which would not "alter, destroy, mutilate, or conceal" that evidence under 1512(c)(1), but would plainly "obstruct" or "impede" the proceeding with respect to that evidence under Section 1512(c)(2). For similar reasons, Section 1512(c)(2) would cover displacing lawmakers from the House and Senate Chambers with the Electoral College documents.

The Electoral College vote certification is rooted in constitutional and federal statutory law that requires the creation and consideration of various documents, and that certification operates through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections. Had Smith sought to alter or destroy any of those documents, he would have violated Section 1512(c)(1). Here, Smith sought to stop Members of Congress from reviewing those constitutionally and statutorily mandated documents at a proceeding to certify the results of the 2020 presidential election. Thus, even if a violation of Section 1512(c)(2) covered only obstructive behavior that prevents the consideration of documents, records, or other objects at an official proceeding, Smith's conduct—corruptly obstructing and impeding

the examination of physical or documentary evidence at a congressional proceeding—states an offense.

### III.   Congress's Joint Session to Certify the Electoral College Vote Is a "Proceeding Before the Congress" under Section 1515(a)(1)(B) and, therefore, an "Official Proceeding" under Section 1512(c)(2).

Smith argues that the term "official proceeding" refers to "tribunal-like proceedings related to adjudication, deliberation, and the administration of justice, all features which the electoral count lacks." ECF No. 66 at 9. This argument is also contrary to the plain language of the statute and has been unanimously rejected by courts in this district.

The plain text of Section 1512 establishes that the Joint Session is an "official proceeding." To determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted). Section 1515(a)(1)(B), as noted, defines "official proceeding" as a "proceeding before the Congress." In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, or "a proceeding before the Congress." Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation omitted); *Bingert*, 605 F. Supp. 3d at 119.

Congress's Joint Session to certify the Electoral College vote constitutes a "proceeding" under any interpretation of that term.  In its broadest and most "general sense," a "proceeding" refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting *Proceeding*, Oxford English Dictionary, available at http://www.oed.com).  Smith cannot meaningfully contend that Congress's Joint Session to certify the Electoral College vote, which involves a

detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding – and indeed an official proceeding – under that broad definition.

A narrower definition of the term "proceeding" would look to the "legal – rather than the lay – understanding" of the term. *Ermoian*, 752 F.3d at 1170.  This narrower definition includes the "business conducted by a court or other official body; a hearing."  Black's Law Dictionary, "Proceeding" (11th ed. 2019).  Taken with its modifier "official," the term "proceeding" thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170.  But even under this narrower definition, Congress's Joint Session to certify the Electoral College vote – business conducted by an official body, in a formal session – would easily qualify.

The formality involved in the certification of the Electoral College vote places it well within the category of an official proceeding, even under the narrower legal definition of the term "proceeding."  Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for Congress's certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Required by law to begin at 1:00 pm on the January 6 following a presidential election, Congress's meeting to certify the Electoral College vote is both a "hearing" and "business conducted by … [an] official body." *See* Black's Law Dictionary, "Proceeding." The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15.  As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.*  And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall."

*See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform"). Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared." *Id.* Under the plain meaning of Sections 1512(c)(2) and 1515(a)(1)(B), Congress's Joint Session to certify the Electoral College vote is a "proceeding before the Congress." That alone disposes of the Smith's contentions. *See Bingert*, 605 F. Supp. 3d at 120 (extensive procedural requirements of the Electoral College certification delineated in 3 U.S.C. § 15 qualify the certification as a proceeding before Congress).

Congress's certification of the Electoral College vote would qualify as an adjudicatory proceeding. Congress's certification of the Electoral College vote as set out in the Electoral Count Act of 1887 involves the administration of justice; the certification of the Electoral College vote involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]." 3 U.S.C. § 15. That Joint Session renders judgment on whether to certify the votes cast by Electors in the presidential election. Under the Constitution, the Electors create "lists" of the presidential and vice-presidential candidates, which they "sign" and "certify" before sending to Congress. U.S. Const. amend. XII. Congress then decides whether to count those certified lists, or certificates in conformity with the Electoral Count Act. 3 U.S.C. § 15. As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it. 3 U.S.C. § 15.

And just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result." 3 U.S.C. § 16. Even under Smith's theories, Congress's certification of the Electoral College vote possesses sufficient "tribunal-like" characteristics to qualify as an "official proceeding," as this Court and other judges in the District have already concluded. *See United States v. Robertson*, 588 F. Supp. 3d 114, 121 (D.D.C. July 5, 2022); *Sandlin,* 575 F. Supp. 3d at 22-24; *Caldwell*, 581 F.Supp.3d at 11; *Nordean*, 579 F. Supp. 3d at 43; *McHugh*, 2022 WL 296304, at *9.

Smith nevertheless argues for a narrow definition of "official proceeding" in Section 1512. But this narrow reading of the statute finds no textual support when applied to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress." Had Congress wanted to impose a definition that more closely resembled a quasi-adjudicative setting (as Smith contends by demanding investigation and evidence as prerequisites for a proceeding), it needed to look only a few provisions away to 18 U.S.C. § 1505, which criminalizes, among other things, the obstruction of (i) "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency; and (ii) "the due and proper exercise of the power of inquiry under which any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees. 18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020). If Congress wished to similarly limit the obstruction prohibition under § 1512(c)(2) to congressional investigations and the like, it could have enacted language similar to Section 1505. Instead, Congress chose different terms, with different meanings. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each."). Congress enacted broader language ("a proceeding before the Congress") that covers a

broader range of proceedings than only the "inquir[ies] and investigation[s]" envisioned in Section 1505. That broader definition includes the Electoral College vote certification that Smith obstructed on January 6, 2021.

None of Smith's contrary arguments have merit. His effort to revise the definition of proceeding relies on the Ninth Circuit's decision in *Ermoian*, 752 F.3d 1165. But *Ermoian* involved a different statutory definition, 18 U.S.C. § 1515(a)(1)*(C),* and an entirely different issue: whether an FBI investigation counts as "a proceeding before a Federal Government agency which is authorized by law" under Section 1515(a)(1)(C). In *Ermoian*, the Ninth Circuit reasoned at the outset that the term "proceeding" did not "conclusively resolve whether an FBI investigation qualifies" because narrower definitions of the term "would exclude criminal investigations in the field." 752 F.3d at 1170. This case, which involves a proceeding before Congress and implicates Section 1515(a)(1)*(B)* (and not *(C)*), presents no such question. Judge Moss, and other judges in this District citing *Montgomery*, were free to find *Ermoian*'s analysis unpersuasive or inapplicable given its different facts and interpretation of a different provision under Section 1515 that does not involve Congress. And, in any event, the Joint Session of Congress to certify the Electoral College vote would satisfy even the narrower formulations of "proceeding" cited in *Ermoian*. The Joint Session plainly constitutes "*business conducted* by a court *or other official body*; a *hearing*," or "[a] legal … process." *Id.* at 1169 (emphasis added). And there can be no serious dispute that the Joint Session is a "proceeding … authorized *by law*" or that it has the "sense of formality" that the Ninth Circuit found absent from mere criminal investigations. *Id.* at 1170 (emphasis added).

The neighboring provisions of Chapter 73 (such as 18 U.S.C. §§ 1503, 1504, 1507, 1521) – which criminalize obstruction of other types of investigations and protect judges, jurors,

witnesses and the like – underscore how robustly Congress sought to penalize obstructive conduct across a vast range of settings. That Congress wished to penalize efforts to obstruct everything from a federal audit to a bankruptcy case to an examination by an insurance regulatory official only crystallizes that it is more the acts of obstructing, influencing, or impeding – than the particular type of hearing – that lie at "'the very core of criminality' under the statute[s]." *Williamson*, 903 F.3d at 131.

Even putting aside that the "best evidence of [a statute's purpose] is the statutory text adopted by both Houses of Congress and submitted to the President," *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), the obstruction statute's legislative history confirms that Congress intended "official proceeding" to reach broadly. Although Congress enacted Section 1512(c) as part of the Sarbanes-Oxley Act of 2002, Section 1512(c) adopted – but did not modify – the pre-existing definition of "official proceeding" in Section 1515(a)(1), which had been in place since 1982. *See* Victim and Witness Protection Act of 1982 ("VWPA"), Pub. Law 97-291, § 4(a), 96 Stat. 1252.  And, tellingly, in considering the VWPA in 2002, the Senate Judiciary Committee urged the inclusion of a "broad residual clause" – in a provision that was ultimately omitted from the 1982 enactment, but that resembles the current iteration of Section 1512(c)(2) – precisely because the "purpose of preventing an obstruction or miscarriage of justice cannot be fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses. There must also be protection against the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice." S. Rep. 97-532, at 18 (1982).  The upshot is clear: when it enacted the operative definition of "official proceeding," Congress intended that term to be construed broadly, not narrowly. And this case underscores Congress's foresight in doing so: Smith sought to thwart justice in an unprecedented and inventive manner, by literally driving

Congress out of the chamber.

Smith's characterization of Congress's Electoral College vote certification as merely "official business" that falls outside Section 1512(c)(2) misinterprets the plain meaning of "official proceeding," the statutory structure, and legislative history outlined above. The system of objections, debate (where in 2021, some Members presented evidence of election irregularities and others counterevidence of election validity), and Congress's ultimate "decision" to overrule or sustain the objection satisfy either the broad or narrow reading of "official proceeding" under Section 1512(c)(2). *See* 3 U.S.C. § 15.

Since the events of January 6, 2021, at least 12 judges in this district have considered whether Congress's certification of the Electoral College vote constitutes an "official proceeding" for purposes of Section 1512(c)(2). They have all ruled that it does, largely adopting the government's rationale and rejecting the arguments that Smith presses in this case. *See, e.g.*, *Hale-Cusanelli*, No. 21-cr-37, 2022 WL 4300000, at *1 (*see also* ECF No. 82 at 2-4) (McFadden, J.); *Robertson*, 588 F. Supp. 3d at 121-122; *Sandlin,* 575 F. Supp. 3d at 23-24 (Friedrich, J.); *Caldwell*, 581 F. Supp. 3d at 11-16 (Mehta, J.); *Mostofsky*, 579 F. Supp. 3d at 24-25 (Boasberg, J.); *Montgomery*, 578 F. Supp. 3d at 61-70 (Moss, J.); *Nordean,* 579 F. Supp. 3d at 41-43 (Kelly, J.); *McHugh*, 2022 WL 296304, at *5-9 (Bates, J.); *Grider*, 585 F. Supp. 3d at 28-29 (Kollar- Kotelly, J.); *Miller*, 589 F. Supp. 3d at 66-67 (Nichols, J.); *United States v. Andries*, No. 21-cr-093 (RC), 2022 WL 768684, at *3-7 (D.D.C. Mar. 14, 2022) (Contreras, J.);  *Puma*, 596 F. Supp. 3d at 97-102 (Friedman, J.).  Nothing in Smith's briefing warrants departing from that well-reasoned line of decisions.

### IV.    The Rule of Lenity Does Not Apply.

Text, structure, history, and other tools of statutory interpretation unambiguously

demonstrate that Section 1512(c)(2) prohibits any conduct that obstructs or impedes an official

proceeding, and the *mens rea* and nexus requirements ensure that the provision does not ensnare

conduct that is "not inherently malign." *Arthur Andersen*, 544 U.S. at 704. Accordingly, the rule

of lenity has no role to play.

"When Congress leaves to the Judiciary the task of imputing to Congress an undeclared

will, the ambiguity should be resolved in favor of lenity." *Bell v. United States*, 349 U.S. 81, 83

(1955). That principle underlies the "venerable rule of lenity," *United States v. R.L.C.*, 503 U.S.

291, 305 (1992) (opinion of Souter, J.), which ensures that "legislatures and not courts" define

criminal activity given the "seriousness of criminal penalties" and the fact that "criminal

punishment usually represents the moral condemnation of the community." *United States v.

Bass*, 404 U.S. 336, 348 (1971); *see Liparota v. United States*, 471 U.S. 419, 427 (1985)

("Application of the rule of lenity ensures that criminal statutes will provide fair warning

concerning conduct rendered illegal and strikes the appropriate balance between the legislature,

the prosecutor, and the court in defining criminal liability.").

The rule of lenity does not come into play when a law merely contains some degree of

ambiguity or is difficult to decipher. The rule of lenity "only applies if, after considering text,

structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute,

such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560

U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Young v. United States*,

943 F.3d 460, 464 (D.C. Cir. 2019). To trigger the rule, a court must find "grievous ambiguity"

that would otherwise compel guesswork. *See Ocasio v. United States*, 578 U.S. 282, 295 n.8

(2016) (internal quotation marks omitted).  "Properly applied, the rule of lenity therefore rarely

if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating

to complex rules, can often be solved.'" *Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).

Simply put, the rule of lenity is "inapplicable" here. *Sandlin*, 575 F. Supp. 3d at 29. Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings—regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself. Any such distinction between these forms of obstruction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who intimidates and physically blocks those conducting that proceeding escapes criminal liability under the statute. Not only does the rule of lenity not require such an outcome, but such an application loses sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted. *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring). No defendant focused on stopping an official proceeding through unlawful means could reasonably profess surprise that his conduct might fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so." 18 U.S.C. § 1512(c)(2).

## CONCLUSION

For the foregoing reasons, the Court should deny Smith's motion to dismiss Count Three.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Victoria A. Sheets*

VICTORIA A. SHEETS

Assistant United States Attorney
NY Bar No. 5548623
601 D Street NW
District of Columbia, DC 20530
(202) 252-7566
victoria.sheets@usdoj.gov

MELANIE L. ALSWORTH
Ark. Bar No. 2002095
Trial Attorney
On detail to the USAO-DC
601 D Street, N.W.
Washington, DC 20530
(202) 598-2285
melanie.alsworth2@usdoj.gov


TIGHE R. BEACH
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
CO Bar No. 55328
(240) 278-4348
tighe.beach@usdoj.gov