IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

V.  CAUSE NO. 1:21-cr-00599-RBW

THOMAS HARLEN SMITH

SENTENCING MEMORANDUM

Defendant, Thomas Smith, by and through counsel, respectfully submits this Sentencing Memorandum pursuant to 18 U.S.C. § 3553(a), and would respectfully show as follows:

In January 2001, Mr. Smith went to Washington, D.C. to attend a rally he believed would be historic. His news was derived from right-wing sources, which were feeding conspiracy theories about an election that had been stolen, Mr. Smith felt that attending a protest was necessary. He did not bring weapons, body armor, or tools to inflict harm upon another. At that time, these conspiracy theories had not been debunked. Some people adhere to these beliefs even today.

After attending a rally and listening to former President Trump, Mr. Smith walked with his cousin, Mr. Donnie Wren, to the Capitol. Mr. Smith had heard the former President state that he was going to the Capitol to speak, and he wanted to attend. He had traveled from Mississippi in a work truck, pulling a trailer devoid of electricity or water for him and two others to sleep in. He intended to support Congress in doing what he was told and believed was the correct thing — question the results of the election. There were members of Congress who voted against certifying the election results because of this uncertainty. Mr. Smith was getting information from Fox News and right-wing networks urging him to further his constitutional responsibilities. Otherwise, Mr. Smith has never been much of a political person. His only involvement in a political process was in protesting a change in the Mississippi flag after citizens had voted to not make any change. He testified to attending a peaceful protest on the steps of the state in Jackson, Mississippi. He advised,

during the trial of this matter, that he also supported police officers. He has provided signs carried that day, a copy of only two of the banners he held are attached as an exhibit to this memorandum.

Mr. Smith has great respect for law enforcement officers and the duty they offer. Mr. Smith applied for employment with the Sheriff's office in Winston County, Mississippi. The only reason why he chose not to pursue the employment was that it would be a loss in income, and he had three children to take care of.

Mr. Smith's children are the most important thing in his life. His son, Scott Smith, lives with him. Scott had a bi-racial friend in high school who had parents dealing with addiction issues. The young man's home life was unstable and he was neglected, and he moved in with Mr. Smith for approximately two years, who cared for him as it he were his own child; he remains close with the young man today. Mr. Smith's daughter, Sophia, has lived with him for long periods, and was back and forth between his house and her mother's. Her mom has bipolar issues, and Mr.. Smith's small home offers a safe haven for Sophia when times are tough.

Mr. Smith frequently assists his local volunteer fire department. In small town Mississippi, he has equipment and skills that the county cannot afford to pay. His work truck has emergency lights, and at their request, he helps block traffic and does clean up after wrecks. He does dozier work and excavation for local projects.. He helps the town of Mathiston, Mississippi with other projects as well. Letters of support echo his dedication and efforts. There are very few people in town. He helped clear the area for a baseball park to be installed. He has worked to help fix water leaks, and other utility projects, since the town does not have the tax base to own its own department, and others in the area lack his knowledge and experience.

Mr. Smith volunteers with his church group at three different rehabilitation facilities, providing support for addicts and the downtrodden. He was baptized shortly before the incident bade basis of his charges, An attached photo shows him standing in the tub used during the service.

Attached letters confirm his dedication.  He lists three reasons why he loves doing the work — his faith, helping others who are in need, and being able to share music.  While Mr. Smith is a talented pianist, he plays guitar and drums for the rehabilitation facilities (his church lost their drummer and he had to learn.).

He has volunteered for the Wounded Warrior project and Catch-A-Dream Foundation, making locations accessible for handicapped individuals.  He never charged a dime.  In her letter of support, Ms. Brandy McCollum, who has known Mr. Smith for more than 20 years, noted, "He volunteers his time to the less fortunate.  He has built wheelchair ramps for several in the community, not to mention the endless driveways repairs and homes he helps repair at no cost to the owner.  He is an active member of his church, has been baptized, and is learning to play drums for the choir."

Mr. Smith has been programming heavily while in custody.  Since his imprisonment, he has completed over 60 hours of programming and is a trustee, perhaps the only January 6 defendant to earn that privilege.  He earned the role of trustee quicker than anyone; he helps officers and is very respectful.

Mr. Smith splits his time between his handicapped father and his kids.  He would respectfully request an opportunity to be released for a short period of time out of custody and allowed to voluntarily surrender.  His father's houses in the Mississippi Delta is thirteen feet off the ground, lying right off the Mississippi river.  His father's legs were amputated any uses a wheelchair.  He cannot get out of the house if there is a fire or emergency.  Mr. Smith would like to finish the elevator and ramp since his father cannot afford to pay others.

His stepmother, Karen Smith, submitted a letter confirming his efforts:

> I have COPD and his daddy lost his legs above the knees two years ago.  Tommy build an elevator for our home (Mr. Smith would note that it is not yet finished.)  We live 15 feet above the ground so his daddy could get in and out of the house.  He was

coming out regularly to check cables and would cut grass every two weeks. He had taken over paying the phone bill since we are on a fixed income and always asks if we need anything.

Jadyn Thole, echoes these comments. "Thomas is a great guy in every sense of the word. He is dependable, honest, and always willing to lend a helping hand to those in need. His integrity and sencerity shine through his words and actions, and he is someone whom people can trust without hesitation."

On January 6, when Mr. Smith lost his Mississippi flag, he was helping up a Prince George police officer. The court is aware of video showing his flag being thrown by another, but Mr. Smith is seen far away from the area. He was assisting others up from the ground. In recorded interviews, Mr. Smith mentioned helping up person in the green jacket. It was not until trial that he realized the person he helped had to be a Prince George police officer. While helping the officer, as he gave up his flag, he was struck with police batons. He felt wrongfully attacked, which he did not understand and led to stress . He believe this was unnecessary and unjust, causing him to be upset. He reiterates that the people around him were just asking the police to slow or stop their push so that others would not be not trampled. An example would be the exhibit admitted into evidence at trial of the elderly individual who was bleeding profusely from having been struck. This is not offered as a justification, but for context.

Mr. Smith testified regarding his contact with Officer Rowland, where he kicked or pushed him to the ground after he observed the officer rushing toward a fallen person. He believed that the officer, who held his baton in both hands while ascending the steps, was going to hit the elderly individual on the ground. He had just been struck himself. Mr. Smith was immediately sprayed with a form of pepper gas and fled. Officer Rowland testified he earlier told Mr. Smith he could stay on the grounds of the Capitol until his supervisor told him they had to leave. Mr. Smith does not remember this. Regardless, when officers pressed to clear the area, he wished he had been more

responsive, but as support letters suggest, he is the person who tries to help others. This is a consistent theme in all of the submitted letters. A lifetime of service to others has been rendered somewhat immaterial because of the events on January 6, but the people who know him best believe otherwise.

After his contact with Officer Rowland, subsequent images show that Mr. Smith fled the area, show him in close proximity to a flash-bang, which disoriented him (as flash bangs are designed to do) and rendered two others flat on the ground. Videos seen during trial show that, as he was helping an elderly gentleman to his feet, Mr. Smith was shot with a weapon deemed "less than lethal," though officers admitted during trial that is could be lethal. He was shot at a range of approximately fifty to a hundred feet. This was a direct hit by Office Campanella on a person who was not a threat, and Mr. Smith does not offer this as an attempt to gain pity, but context for what happened next.

What followed next was the result of the emotions derived as a result of the last few minutes. Mr. Smith felt that he was wrongfully targeted by unjustified baton beatings and being shot for helping men up from the ground.

Mr. Smith is compelled to offer insight into prior convictions listed in the Presentence Investigation Report that are bare-boned comments of allegations against him. The truth requires more.

In regard to paragraph 95 of the Presentence Investigation Report (PSR) regarding the opening of a coffin in Bolivar County, Mississippi in 1997, twenty-five year ago, Mr. Smith would show that one of the men listed in the paragraph is Donnie Wren's brother. Older individuals had beer and alcohol and he and two others went in tow. They were right beside what is referred to as the "Baby Doll" house, a colloquial "local haunted house." The older individuals thought it would be scary and started talking about digging up a grave. Mr. Smith, his brother, Jimmy, and Jennifer

Coleman went back to the car. Mr. Smith was only 18 and not accustomed to drinking. While he did not desecrate the grave, he entered a plea of guilty based upon the advice of his attorney.

In regard to the 1997 conviction for burglary of a building, Mr. Smith would show that he worked for an individual name Gaylen Smith (no relation). Power had been cut off at a location where he worked. He borrowed a heater from his boss. His employer had not paid him for several weeks, and, at age 19, Mr. Smith asked to be paid what he owed. He had been given permission to use the heater, but after demanding payment, law enforcement was called and he pled guilty to avoid jail time.

The DUI conviction from 2011 indicates there is an active warrant for his failure to pay fines. Mr. Smith would note that the fine was turned over a collection agency, and he has paid down his fines to approximately $400.

In regard to paragraph 98, Mr. Smith would note that he took a vacation with his children and his daughter brought one of her friends. The friend of his daughter stayed three of the four days, and her mom did come to pick her up. Sophia and Anna slept in a private, though there were seven and eight teenagers there. He kept the girls from going out with the older boys. Mr. Smith apologized that the sole Xanax pill the been left in the open, and notes that the young girl recanted her story eventually. In her letter of support, Mr. Smith's daughter states:

> The Florida situation was a misunderstanding. No, he did not give us medication but we took it without asking. Being the adult in the situation he got blamed for it. I just did not want for you to think that he was giving out prescription medication to us.

In regard to employment with the Oktibbeha County Road Department in paragraph 102, Mr. Smith would show that he left employment in August, 2019 when he filed a lawsuit for unlawful termination against the county. The local county administrator had told the State Department they had video of him using a county credit card in order to buy gas for his personal vehicle. This turned

out to be false. The charges were dismissed. Mr. Smith did take gasoline from a work truck and put it into a welding machine on a job site they were working. He did welding on Army metal bridges that needed repair. He took approximate 3 gallons from the truck to put in the welder. He complained they used this action as retaliation. The case has been stale for over 2.5 years and has retained an attorney to address the false allegations.

In paragraph 110, Mr. Smith would note that his son Scott moved in with him six years ago, but he continued to pay child support for him. The last sentence of the paragraph references whether the obligation is court-ordered. It is, and he paid his monthly support until being taken into custody.

The allegation in paragraph 27, alleging the Mr. Smith threw a light pole "intentionally threw (the pole) at Officer Campanella's head" is utter fabrication. No one could throw such a light weight instrument knowing its destination.

Paragraph 77 also alleges incorrect assumptions about Mr. Smith seeing a pole thrown from behind his position, striking an officer, and him stating "you deserve that" in response. Video evidence does not corroborate the averments in the PSR. Mr. Smith never saw that object and was commenting on the officer being struck by another officer with a baton. This occurred seconds after he had been struck by a baton. The allegation is devoid of merit.

## REQUESTED RELIEF

Based on the grounds set forth above, Defendant, Thomas Smith, respectfully requests that the Court impose the lowest sentence deemed appropriate. Remaining in custody since the jury's verdict, he has applied himself toward being the type of person he expects and holds himself to achieve. He takes responsibility for his actions, and submits that his involvement was influenced by what he gleaned from news sources. His decisions that day placed himself and his liberty in peril. While this is not offered as an excuse, the letters of support accompanying this memorandum give a far more accurate indication of who he is as a person. The prosecution's request for a 168 month

sentence is, respectfully, absurd. Their recommendation is not even based upon an accurate guidelines range listed in the Presentence Investigation Report. Understanding the magnitude of his situation, he respectfully requests that the Court allow him bond and the ability to voluntarily report to serve any sentence imposed. He would like to complete projects to serve him father and return heavy equipment from prior job sites.

Respectfully submitted,

THOMAS SMITH

/s/ Gregory S. Park
GREGORY S. PARK, MSB No. 9419
Assistant Federal Public Defender
1200 Jefferson Avenue, Suite 100
Oxford, Mississippi 38655
Telephone: (662) 236-2889
Fax: (662) 234-0428
greg_park@fd.org

CERTIFICATE OF SERVICE

I, Gregory S. Park, attorney for Defendant Thomas Smith, do hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which provided notification to all parties of record.

Dated this the 10th day of August, 2023.

/s/ Gregory S. Park
GREGORY S. PARK
Assistant Federal Public Defender